Filed 9/13/23  In re K.H. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.H. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>S.A. et al.,<br><br>    Defendants and Appellants. | G062394<br><br>(Super. Ct. Nos. 20DP1070, 20DP1071)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Mary Kreber Varipapa, Judge.  Affirmed.

Christy C. Peterson, under appointment by the Court of Appeal, for Defendant and Appellant S.A.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant A.H.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

\*          \*          \*

In August 2020, police investigated a call of suspected child abuse at a motel room. Three children were present: K.H. (an eight-year-old boy), A.H. (a five-year-old girl), and P.A. (an 18-month-old girl). The boy and the older girl showed signs of serious physical abuse that had occurred over a substantial period of time. Police arrested S.A. ("Mother"), and A.A. ("Father A."). At that time, A.H. ("Father H."), the father of the two older children, was incarcerated in Houston, Texas.

The Orange County Social Services Agency (the Agency) took custody of the children and placed them with foster mother D.R. ("Caregiver"), where they remain to this day and appear to be doing well. The Agency filed a petition charging serious physical harm and four related allegations. (Welf. & Inst. Code, § 300 et seq.)[1]

At a jurisdiction hearing, the juvenile court found all but one of the five allegations true. At a later disposition hearing, the court declared the children dependents, ordered no reunification services for Mother and Father A., ordered reunification services for Father H. (with a modified visitation order), and denied a request for placement with Father H.'s aunt S.C. ("Great Aunt") in Houston, Texas.

Father H. claims: A) substantial evidence did not support some of the allegations at the jurisdiction hearing; B) the court did not apply the correct legal standard at the disposition hearing (regarding his request for custody of the children); C) the court abused its discretion as to the visitation order; and D) the court abused its discretion by denying the request for placement with Great Aunt (Mother joins as to this claim).

We find: A) the first claim is moot because it is undisputed that some of the claims were supported by substantial evidence; B) the court referenced the wrong statute regarding Father H.'s request for custody, but there was no prejudice; C) Father H. forfeited his objection to the visitation order; and D) the court did not abuse its discretion by denying the request for relative placement. Thus, we affirm the judgment.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code; the word "subdivision" and/or its abbreviation will be omitted throughout.

# I

## FACTS AND PROCEDURAL BACKGROUND

On August 24, 2020, at approximately 2:00 a.m., Buena Park police were dispatched to a motel for a child abuse investigation. Present were an 18-month-old girl, a five-year-old girl, and a 10-year-old boy. One officer observed the boy had "bruising and welts to the right side of his face." The boy also had "extreme bruising and welts" on his shoulders and arms in a pattern indicating he had been "hit with the studded side of a belt." Another officer "discovered more marks on his back, legs and below his armpits."

Mother admitted she had "whooped" the boy with a belt for being disrespectful. Mother said she was aiming for his bottom, but he was moving around, so she hit him on the arms and the side. Mother also admitted "she was so enraged at [the boy]'s behavior, while hitting him with the belt, she wasn't paying attention to the marks on [his] body."

The boy was transported to a hospital. A pediatrician observed "'numerous large bruises to his right face, thighs, arms and upper back, many of which are patterned. Bleeding labs performed are normal, therefore there appears to be no overt problem with his ability to clot. There has not been accidental trauma history provided to account for all of these current bruises, especially the patterned bruises. These injuries are most consistent with inflicted trauma (child physical abuse).'"

A forensic examination of the older girl showed she "has multiple linear, curvilinear, looped, red marks that [she] stated are from a whooping with a jump rope on more than one occasion. The marks are from an object that can be looped and has a small diameter, which could be a jump rope. The marks are of different ages – acute (fresh) and some are older (diffuse and/or hyperpigmented). The multiple patterned bruises are from more than one event of physical abuse."

When questioned by a social worker, the boy initially made excuses for the marks on his body. Eventually he admitted Mother disciplined him with a belt and Father

A. hit him with his hands. Sometimes Mother would hit him so hard he bled. The boy had to be quiet when he was being hit so the neighbors would not contact the police. The boy was afraid Mother would learn he was telling the social workers what happened; Mother and Father A. had told the children not to say what went on because they did not want to go to court.

The older girl told the social worker she and the boy were regularly beaten by Mother and Father A. with belts, ropes, and phone charging cords. The abuse had occurred in California and Texas. Like the boy, the older girl had been told not to tell anyone about the abuse, and she was afraid Mother and Father A. would whoop her if they found out she told anyone about the whoopings.

*Initial Juvenile Court Proceedings*

On August 25, 2020, the Agency filed a juvenile dependency petition. The petition alleged serious physical harm, failure to protect, serious emotional damage, no provision for support, parental cruelty, and abuse of sibling. (§ 300 (a)-(c), (g), (i), (j).)

On August 25, 2020, the Agency filed a detention report; Mother and Father A. had been interviewed at the jail. Mother stated she and Father A. had moved from Houston, Texas and had been living in the Orange County motel for about three weeks. Mother said she had no contact information about Father H. The Agency contacted a child protection agency in Houston, Texas and discovered three prior allegations of child neglect against Father A.

On August 27, 2020, the Agency filed a first amended petition and an addendum report. The report noted the children were to be placed in a licensed foster home. The report noted Father H. was in custody in Houston, Texas (it was later discovered this was for a conviction of aggravated assault with a deadly weapon).

On August 28, 2020, the juvenile court conducted a detention hearing. Mother and Father A. appeared remotely from jail. Mother's counsel reported Father H.

4

had "paid minimal child support and seen the kids about maybe four times a year roughly." The court found "it is of immediate and urgent necessity for protection of the [children] that the [children] be detained under the protective custody of [the Agency]."

On September 11, 2020, Mother pleaded guilty to two misdemeanor counts of corporal injury on a child. (See Pen. Code, § 273d, subd. (a).) The superior court granted four years of informal probation with 120 days in county jail.

On January 12, 2021, the Agency filed a report noting Mother had been released from local custody and had called from Texas. Mother reported she was pregnant and asked about the Interstate Compact on the Placement of Children (ICPC). Father A. was no longer involved in the proceedings.

*Later Disclosures of Abuse*

The boy later disclosed he would get "whoopings" with extension cords when there were any issues with his schoolwork, and the beatings would continue if he made noise or moved while being beaten. The boy and the older girl were made to stand in the corner without sitting for hours. They were punished by being given only bread and water for days at a time. Mother would whip his hamstrings so hard he could not lay down to sleep at night. Mother punished the older children by making them lie on their backs and hold their legs slightly off the ground. They would get another beating if they put their legs down or held "them up too high."

During one beating the boy was in so much pain he moved, so Mother taped his feet to the floor. The boy broke free and started running to his grandmother's house, but Mother caught him. She then put super glue on his hands and feet and "stuck all of them to the floor and then whooped" him. Eventually, Mother used a knife to cut one of his hands free and gave him the knife to free his other hand and his feet; the boy cut his hand freeing himself.

Mother once taped the boy to the couch and beat him with a curtain rod.

5

Mother sat on the boy for an hour while he was face down on the couch; the boy said that "'was the worst one ever'" because he could not breathe. Mother sat on the older girl, for about 20 minutes; she was screaming. Father A. taunted the boy by telling his school class that he pees on the couch and still has accidents. Father A. beat the boy with a piece of wood with nails in it.

On the night the parents were arrested, Mother threatened to kill the boy. Mother told Father A. "to take over and stated 'now you're really going die.'" Father A. beat the boy so hard "he could feel the hits 'all the way to my bones.'" The boy screamed to Mother, "'help me he's going to kill me,'" but Mother just stood there watching. Mother had a pistol in her purse as well as a shotgun, and Father A. had an assault rifle and an Uzi.

Mother hit the older girl with a wire hanger. She would be slapped in the face if she looked down while she was walking. The children would be slapped in the face if they were not wearing socks in the house. As a punishment, they would have to hold a watermelon with their arms stretched out in front. Punishment also included being fed a frozen corn dog and having to wait until it thawed to eat it. They would also be told when they could use the bathroom.

The boy said "it was bad living in Houston due to the whoopins, being slapped in the face and [Father A.] hitting him on the bottom with a metal curtain rod." The boy also stated Mother had given Father A. permission to give him "'whoopins'" and Father A. hit harder than Mother. Father A. hit him with a belt, metal hangers, and "lots of other stuff." On one occasion Father A. slapped the boy across the face, and Mother put makeup on the mark and told him not to tell anyone about it. When his teacher asked what happened, the boy did not tell her the truth, but the teacher spoke to Mother about it. When they got home, Mother hit him on his bottom, legs, and back with a piece of wood, believing he had disclosed the abuse to the teacher. The boy said he was sometimes beaten so severely he could not "sit on a chair and had to squat to sit down."

6

The boy witnessed domestic violence between Mother and Father A., but Mother told him not to talk about it. Mother and Father A. fought with their hands and with other objects; Father A. threw chairs at Mother, pulled her hair, and stood on her body. Father A. threatened to hurt Mother if she told anyone about the abuse. Once Mother went to the hospital after a beating due to a "headache." The boy saw Father A. hit Mother with the side of a pistol "on top of her head and her jaw." The boy was scared and crying in his bed; Father A. pointed the pistol at the boy and threatened to kill him if he did not shut up. Father A. made the boy "smoke weed." The boy was crying and got a headache; Mother put his head in the freezer and said Father A. would make the boy smoke again if he caught him crying.

The older girl saw Father A. give the boy "whoopins on his private parts with a belt." Father A. gave "most of the whoopins" with a jump rope or "with nails on a belt." The older girl witnessed Mother and Father A. throw things at each other and saw Mother's injuries, including an injury on her forehead above her eye. She confirmed Mother carried a gun in her purse and Father A. had a large gun "he shot in the air." The older girl said "they received lots of whoopins" while living in Texas.

*The Jurisdiction Hearing*

In January 2021, the Agency filed a second amended petition alleging: (1) serious physical harm (§ 300 (a)); (2) failure to protect (§ 300 (b)(1)); (3) serious emotional damage (§ 300 (c)); (4) no provision for support (§ 300 (g)); and (5) cruelty (§ 300 (i)). Each allegation alleged conduct by Mother and Father A. As to Father H., it was alleged he was presently "incarcerated. [Father H.] is not able to provide for the safety, support, and protection of the children, and is not available to provide or arrange for appropriate care for the children." (§ 300 (g).)

In March 2021, the juvenile court conducted a jurisdiction hearing. The court found Father H. to be the presumed father of the boy and the older girl. The court

7

found the allegations in counts one through four of the dependency petition were true by a preponderance of the evidence, bringing the children within the jurisdiction of the juvenile court. (See § 300 et seq.)

There were several protracted hearings as to whether California or Texas had subject matter jurisdiction of this juvenile dependency matter under the provisions of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). This court agreed with the juvenile court that Texas had ceded subject matter jurisdiction under the UCCJEA to California. (*A.H. v. Superior Cou*rt (2023) 89 Cal.App.5th 504, 509–510.)

*The Disposition Hearing*

The disposition hearing began in October 2022, and continued over multiple dates through March 2023. The juvenile court granted Caregiver's request for de facto parent status at the beginning of the hearing. What follows is a brief summary of the testimony of the five witnesses who testified (the court's rulings will be summarized as relevant in the discussion section of this opinion).

*1. The Boy's Testimony*

At the time of his testimony, the boy was 10 years old. The boy wanted to live in California with Caregiver because he felt safe with her. The boy called Caregiver "mom" and hoped she would adopt him and his two younger sisters. The boy gets along with his sisters and wants to stay together with them. On a scale from one to ten, he rated the importance of staying together with his sisters as: "Ten."

The boy was worried that if he went back to Texas, Mother and Father A. would find him. On his last video visit with Mother, he noticed she was still wearing an engagement ring, so he thought Father A. was still around. The boy did not want to visit with Mother or Father H. because he did not want to experience flashbacks or nightmares about his physical abuse, as he had in the past. The boy testified that being with Great

8

Aunt also caused him to have flashbacks and bad memories because he thought Great Aunt knew about the physical abuse in Texas but did not do anything to stop it.[2]

### 2. *The Social Worker's Testimony*

The Agency's social worker testified she had been assigned to this case since the initial detention hearing. Her recommendation was not to offer reunification services to Mother or Father A. because they had inflicted severe physical abuse on the older children. Her recommendation was to offer services to Father H. The social worker felt it was not appropriate to return custody to any of the parents at this time. As to Father H., "I have asked him to complete a parenting class. That has not been completed." The social worker was unable to confirm his drug testing. She noted Father H. "has been attempting to visit. The children have been declining visits."

The social worker was concerned that if the children were returned to Father H., he would not protect them based on his past conduct. The social worker said Father H. "had shared with me during one instance he went to pick up the kids, and the mom came out saying, I'm going to beat [the older girl] if you don't leave. [¶] And so I believe he left. [¶] But he didn't call the police. He didn't call social services." She said she had reason to believe Father H. knew about the abuse going on in the home and did not do anything to prevent it.

The social worker did not recommend placement with Great Aunt; she felt the boy's concerns about Great Aunt's knowledge of the abuse going on in the home was well founded. The social worker recommended the children remain in their current

---

[2] At the conclusion of the boy's testimony, the juvenile court asked him what his favorite subject was in school. He said, "Science and math." The court asked him what he wanted to do when he grew up. The boy said, "Three things." "I would want to be in the Army." He also wanted to be a "scientist" and an "astronaut. In the boy's presence at the end of the hearings while making its rulings, the court said the boy was "flourishing," which the court said is a fancy word for doing "awesome."

placement. She said all three children were bonded to Caregiver, interacted positively, and showed her respect. She testified the children are attached to each other, and it would be emotionally detrimental for them to be separated. The social worker said it would be difficult for the children to be removed from Caregiver because they have stability, they feel safe, and they do not have a relationship with anyone in Texas.

### 3. Caregiver's Testimony

Caregiver testified the children were bonded to her and called her "mom." She said the boy "is very protective with his sisters. Very, very protective. So he's always looking for them." Caregiver asked for placement of the children with her; she felt "moving these children back to Texas would be detrimental to their emotional well-being, physical well-being, well-being in general."

Caregiver testified she had spoken to Great Aunt by phone for about an hour regarding the long-term care of the children. Caregiver said she had concerns about their safety. Caregiver testified Great Aunt told her she would keep the younger girl "as long as she could" and would keep the older children "until their father could get them." Caregiver said Great Aunt told her she had suspicions about child abuse in the past, but there were no specifics.

### 4. Great Aunt's Testimony

Great Aunt said she was surprised to learn of the children being abused. Great Aunt testified she had no concerns about the children being with Father H., because "he's working. He has a steady job. He's doing well, and he's in school. He's trying to better himself and his career, and I've seen him with his newborn daughter." Great Aunt said she did not know Father H.'s "criminal background." Great Aunt testified that if she found out Father H. was currently on probation for a crime of violence, that would affect her opinion. Caregiver testified Mother knows where she lives, but Caregiver said she

10

would keep Mother away from the children.

Great Aunt said the last time she spoke to the boy was about two years ago. Great Aunt testified when the family lived in Texas, she had about 10 interactions with the older children at Christmas parties and family gatherings. She said the next occasion was when she came to California for a face-to-face visit with the children. Great Aunt testified she would still want to have a relationship with the children even if the juvenile court determined it would not be in their best interest to live with her.

### 5. *Father H.'s Testimony*

Father H. testified he had graduated from high school and currently lives in Houston, Texas with his grandmother. He said he "just kind of started" as a cab driver and had worked at multiple jobs "on and off" since 2020. Father H. said he had been taking classes at a community college for about a year in construction management. He said he and Mother met in high school in 2008 and separated in 2017. Father H. testified after the separation he saw the children: "Probably every other weekend." He said Mother started a relationship with Father A. about a month or two after they separated.

Father H. testified he never saw any marks on the children when they visited him. Father H. said Father A. had once threatened him with violence and he called the police. Father H. said prior to being contacted by the Agency, he did not know the children had been taken to California. He testified he had been drug testing with his probation officer since July 2021. Father H. said he currently had a visitation order with the children twice a week. He testified he had participated in phone or video visits with the two girls, but he was told that the boy did not want to visit him.

11

II

DISCUSSION

Father H. appeals claiming:  A) substantial evidence does not support some of the allegations pertaining to him at the jurisdiction hearing; B) the juvenile court failed to apply section 361.2 at the disposition hearing; C) the court abused its discretion by changing the visitation order; and D) the court abused its discretion by denying a request for placement with Great Aunt (Mother joins as to this claim).

We shall analyze each claim.

A.  *The Jurisdiction Hearing Findings as to Father H.*

Father H. claims the juvenile court's findings pertaining to him at the jurisdiction hearing were not supported by substantial evidence.  We find this claim is moot because it is beyond dispute that the findings regarding Mother and Father A. were supported by substantial evidence.

The primary concern of juvenile dependency law is the protection of children.  (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 202.)  "As a result of this focus on the child, it is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child."  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491.)  "Once the child is found to be endangered in the manner described by one of the subdivisions of section 300 . . . the child comes within the court's jurisdiction . . . ."  (*Ibid.*)

It is a fundamental rule of justiciability that an appellate court will not address an issue on appeal if the court cannot give the appellant some form of relief.  (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315 ["When no effective relief can be granted, an appeal is moot"].)  A jurisdiction hearing in a juvenile dependency proceeding is for the purpose of determining the truth of the alleged circumstances, and "it is irrelevant which parent created those circumstances."  (*In re I.A.*, *supra*, 201

12

Cal.App.4th at p. 1492.) "As a result, it is commonly said that a jurisdictional finding involving one parent is '"good against both. More accurately, the minor is a dependent if the actions of either parent bring [the child] within one of the statutory definitions of a dependent."'" (*Ibid*.) Because of mootness, "an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence." (*Ibid*.)

Here, Father H. does not dispute that the allegations concerning Mother and Father A. (serious physical harm, failure to protect, serious emotional damage, etc.) were supported by substantial evidence at the jurisdiction hearing. Thus, challenges to the remaining allegations concerning Father H. (risk of serious physical harm, no provision for support) are moot. (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492 ["an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence"].)

Father H. recognizes the issue of mootness. Nevertheless, he urges this court to exercise discretion and evaluate whether the allegations as to him at the jurisdiction hearing were supported by substantial evidence. He argues the findings at the jurisdiction hearing as to him "serve as the basis for the disposition orders removing the children from his custody and for a reduced visitation schedule" at the later disposition hearing. We see no evidence in the record to support Father H.' s argument. It is true that some of the same *underlying facts* generally support the juvenile court's orders at both hearings. However, we find no evidence that the court's *findings* at the jurisdiction hearing serve as the basis for any of the court's orders concerning placement and visitations about a year later at the disposition hearing.

Thus, we decline to exercise our discretion to consider the moot claims made by Father H. as to the juvenile court's findings at the jurisdiction hearing.

13

*B. Request to Place the Children in Custody of Father H.*

Father H. claims the juvenile court applied the wrong legal standard when it denied his request for custody of the children. We agree that the court referenced section 361 (removal of a child from a custodial parent) when it made its formal findings at the conclusion of the disposition hearing, rather than section 361.2 (placement of a child with a noncustodial parent). However, we find the error was harmless.

In this part of the discussion, we shall: 1) review general legal principles concerning placement of dependent children with noncustodial parents; 2) summarize the juvenile court's ruling at the disposition hearing; and 3) analyze the facts as applied to the appropriate laws.

*1. General Legal Principles*

"When the court has found jurisdiction under section 300, it then must conduct a disposition hearing." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248; § 358 (a) ["After finding that a child is a person described in Section 300, the court shall hear evidence on the question of the proper disposition to be made of the child"].) A disposition hearing determines "'where the child will live while under the court's supervision.'" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

"Under section 361, the court removes children from the physical custodial parent." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1422–1423.) Generally, a child cannot be taken from the physical custody of a parent "unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361 (c)(1), (d).)

14

"Once removal from the custodial parent under section 361 has occurred, section 361.2 requires the court to evaluate placement with the noncustodial parent based on detriment." (*In re Luke M.*, *supra*, 107 Cal.App.4th at pp. 1422-1423.)

"If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be *detrimental* to the safety, protection, or physical or emotional well-being of the child." (§ 361.2 (a), italics added.)

A juvenile court's finding under section 361.2 (a) must be made by clear and convincing evidence and be stated on the record. (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829 ["a finding of detriment pursuant to section 361.2, subdivision (a) must be made by clear and convincing evidence"]; § 361.2 (c) ["The court shall make a finding, either in writing or on the record, of the basis for its determination"].) Under section 361.2, a "court's inquiry properly is more comprehensive than simply whether a child will be physically safe with a noncustodial parent or whether that parent has behaved badly. [Citation.] A court properly may decline placement with a safe and nonoffending parent if that placement would be detrimental to the child's emotional well-being." (*In re A.C.* (2020) 54 Cal.App.5th 38, 46.)

If a juvenile court commits error under the provisions of section 361.2, reversal is required only if the error was prejudicial. (See *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303 [failure to apply section 361.2 (a) is subject to harmless error analysis].) An error is prejudicial if, after examination of the entire case, "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*In re Julien H.* (2016) 3 Cal.App.5th 1084, 1089.)

15

### 2. *The Juvenile Court's Ruling at the Disposition Hearing*

When evaluating placement with Father H. at the disposition hearing, the court recognized that he had been "working very hard" despite some challenging circumstances, which included his physical distance from the children, and "being on probation." The court found Father H. had been participating in therapy, as well as drug and alcohol testing.

The juvenile court then turned to the issue of "the relationship with [Father H.] and the children." The court found during the time Mother and Father H. were together, "they were together with the children, but when they separated for multiple reasons, [Father H.] in many ways just stepped back." The court found as far as the children, that Father H. had "very little contact. He kind of just stayed out of the way of the mother. There were multiple reasons . . . , but the relationship before these proceedings began [between Father H.] and the children . . . was limited." The court said: "Either [Father H.] didn't know what was going on, or he wasn't involved enough to see it, but either way, it presents a problem."

The juvenile court recalled the boy's earlier testimony during the disposition hearing and noted that he "does not feel safe with [Father H.] because [Father H.] did not protect" the boy. The court noted that the boy looked at his relationship with Father H. as "limited and not a stable relationship per se." The court observed the boy "was able to express he wanted to stay with the caretaker, and wanted to be with the caretaker because he feels safe and secure." The court found Caretaker did not exert undue influence over the boy's testimony.

The juvenile court said it was "looking at the relationship, looking at the needs, looking at potential emotional as well as physical abuse that has happened and where we are currently, and the court looks, again, at the best interests of the child. [¶] The court is looking at the fact that these children, again, have been in this current solid placement. No fault of the relatives, no fault being assessed, but where we are right now,

16

to take those children from their current placement is an extraordinarily dangerous situation, as far as emotional and physical well-being."

At the end of the disposition hearing, the juvenile court found "by clear and convincing evidence that section 361 (c)[(1)] and (c)[(5)] applies, and that to vest custody with the parents would *be detrimental* to the children and to vest custody with Social Services Agency Director is required to serve the child's best interests."[3]  (Italics added.)

### 3. Analysis and Application

Prior to the disposition hearing, Father H. filed a brief asking the court to place the children in his custody under the provisions of section 361.2 (a).  This was an appropriate request because Father H. was a noncustodial parent with whom the children did not reside at the time the petition was initiated.  But the court stated at the end of the disposition hearing it was removing the children from both parents' custody referencing sections 361 (c)(1) and 361 (c)(5), the provisions concerning custodial parents.  The court did not make a finding under section 361.2 (c).  Therefore, the court erred.

However, we do not find the error to be prejudicial.  Generally, a juvenile court "shall place the child" with the noncustodial parent requesting custody, "unless it finds that placement with that parent would be *detrimental* to the safety, protection, or physical or emotional well-being of the child."  (§ 361.2 (a), italics added.)  Here, when considering placement with the parents (Mother or Father H.), the court said that it "would be detrimental" to place the children with the parents.

Further, the juvenile court had earlier stated in the disposition hearing that it would be "extraordinarily dangerous" to remove the children from their current

_____

[3] Under section 361 (c)(1):  "There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home . . . ."  Under section 361 (c)(5):  "The minor has been left without any provision for his or her support . . . ."

17

placement when considering the children's "emotional and physical well-being." That is, although the court did not specifically mention section 361.2 (a) when it formally announced its ruling, the court applied the correct legal test (detriment) and appropriately considered the emotional and physical well-being of the children.

In sum, after examining the entire record, we do not think "it is reasonably probable that a result more favorable to [Father H.] would have been reached in the absence of the error." (See *In re Julien H.*, *supra*, 3 Cal.App.5th at p. 1089.)

Father H. argues "had the juvenile court applied the correct legal standard, there is a reasonable likelihood it would have granted [his] request for placement." We disagree. In fact, the court applied the correct legal standard (detriment), it just referenced the wrong statute (section 361, as opposed to section 361.2). Therefore, we do not think it is reasonably probable that had the court referenced the correct statute it would have resulted in a result more favorable to Father H.


*C. Change in Visitation Terms*

Father H. claims the juvenile court abused its discretion when it changed the visitation terms at the disposition hearing (from twice a week to every other week, by phone or video). We find this claim has forfeited, but in any event, we do not find that the court abused its discretion.

We review a juvenile dependency court's rulings regarding parental visitation terms for an abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318–319.) "It is not our function to weigh the credibility of the witnesses or resolve conflicts in the evidence. [Citation.] Rather we must indulge in all reasonable inferences to support the findings of

18

the juvenile court and must review the record in the light most favorable to the juvenile court's orders." (*In re Daniel C.H.* (1990) 220 Cal.App.3d 814, 839.)

In this part of the discussion, we shall: 1) review general legal principles regarding parental visitation of dependent children; 2) summarize the juvenile court's ruling at the disposition hearing; and 3) analyze the facts as applied to the laws.

### 1. General Legal Principles

"In order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent . . . any order placing a child in foster care, and ordering reunification services, shall provide as follows: [¶] (1)(A) Subject to subparagraph (B), for visitation between the parent . . . and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child. [¶] (B) No visitation order shall jeopardize the safety of the child." (§ 362.1 (a)(1)(A) & (B).)

Generally, a juvenile dependency court has the power and responsibility to regulate visitation between dependent children and their parents. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374; § 362.4.) To satisfy this responsibility, a court must "define the rights of the parties to visitation." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) The court may then delegate "ministerial tasks of overseeing the right [to visitation] as defined by the court" to a child protective services agency. (*Ibid*.)

Issues regarding visitation in dependency proceedings are forfeited on appeal by failure to raise the issue or to object in the juvenile court. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 685–686 [parent forfeited challenge to unlawful delegation of visitation authority by not raising issue at trial]; *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1001 [parent forfeited challenge to frequency of visitation by not objecting to visitation schedule].)

19

## 2. *The Juvenile Court's Ruling at the Disposition Hearing*

When making the order for reunification services for Father H., the juvenile court said it "believes that there are going to have to be specific adjustments to the service plan, and that is going to be key to this." The court stated: "We do not want [the boy] to be in the middle of making huge decisions regarding visitation, and to that, we shouldn't place that on the Caretaker. We probably shouldn't place that on the social worker. That probably [needs to] be a decision that is done in a therapeutic setting, and it has been so difficult."

The juvenile court said, "as to the conjoint therapy, I need to make it clear. I'm hoping that [the boy] will work with the therapist. We're not looking to force [the boy] into a situation that is going to be negative for him or any of the children, but I need a therapist to kind of work on those issues." The court stated, "So, I need Caretaker all in. I need [the boy] all in on this: Working with the therapist to make things better, and he has done nothing -- [the boy] has done everything he can to keep working with the therapist, so we're in good shape with that."

As far as visitation order, the juvenile court said: "It may be that [the boy] is not ready. It may be that he is ready, but I need a therapist and professional to be in that position so that we don't have these issues going forward, and that is not just for [the boy]. That's for the other two children as well. [¶] The court is going to authorize that parenting time or that visitation every other week as monitored by the therapist as designated and not to happen unless the therapist indicates that [the boy] is ready. [¶] So, therapist will talk to [Father H.]. The therapist will talk to the children, and then that will go forward as such." The court also stated Father H. "should be sending written letters, and he should be communicating that way with all three children weekly: pictures, letters, whatever needs to be sent."

Father H.'s counsel asked for "clarification as to the changes the court made to the case plan." As to the visitation order, the court replied: "The court is going

20

to continue to order and orders visitation every other week with and between [Father H.] and all three children, but that is to be done with the therapist and with the therapist's input.  [¶]  If the children or the child is not ready for that therapy, then the parenting time of the visitation would not go forward, but absent a finding by the therapist that they're not ready, that that will be court ordered."

Father H.'s counsel said, "just to be clear, it was currently weekly visitation."  The court responded:  "I understand.  I don't think we're going to get a therapist in conjoint or reunification that can do weekly.  So, I don't want to limit [Father H.'s] parenting time, but I think that we need to do at a minimum bi-weekly.  So, I'll make it as a minimum of . . . every other week."

### 3.  Analysis and Application

"When a child refuses visitation, it is the parent's burden to request a specific type of enforcement, or a specific change to the visitation order.  Absent a request, it is not the court's burden to sua sponte come up with a solution to the intractable problem of a child's steadfast refusal to visit a parent."  (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046.)

Here, although Father H.'s counsel asked for "clarification" of the visitation order, counsel did not object to the visitation order on any specific grounds, nor did counsel request a change in the visitation order.  Therefore, we find Father H. has forfeited his claim regarding the visitation order on appeal.  (See *In re Alayah J.* (2017) 9 Cal.App.5th 469, 479 ["the failure to object to a juvenile dependency order on a specific ground generally forfeits a parent's right to challenge that order on appeal"].)

In any event, when fashioning a visitation order at a disposition hearing, a juvenile court has broad discretion to determine what serves the child's best interests, and its decision will not be reversed absent a clear abuse of that discretion.  (*Bridget A. v. Superior Court*, *supra*, 148 Cal.App.4th at p. 300.)

Here, it is apparent that the juvenile court was attempting to act in the children's best interests and within the scope of its discretion when it fashioned the change in the visitation order. By the time of the disposition hearing, the visitations with Father H. had effectively ceased, and it is apparent the court's change in the visitation frequency was an attempt to facilitate visitations that would have a better chance of success. In sum, we find that the court did not act in an arbitrary or capricious manner. That is, even if we were to excuse the issue of appellate forfeiture, we find no abuse of the court's discretion. (See *People v. Carmony* (2004) 33 Cal.4th 367, 378 [a court abuses its discretion when its decision is arbitrary and/or capricious].)

Father H. relies primarily on *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505 (*Hunter*), for the proposition: "The juvenile court cannot impermissibly delegate to the child's therapist, [the Agency], or any third person, unlimited discretion to determine whether visitation is to occur." We do not find this to be an accurate description of the court's visitation order, and we find *Hunter* to be distinguishable.

In *Hunter*, a five-year-old child was detained and placed with a relative while the mother was incarcerated. (*Hunter*, *supra*, 142 Cal.App.4th at pp. 1500-1501.) When the mother was released over a year and a half later, she entered a rehabilitation program where she attempted to maintain contact with the child by phone. The child refused to accept the mother's calls and stopped responding to her letters. (*Id.* at p. 1501.) The juvenile court ordered the child protective agency to set up "'visitation for [the mother] *as can be arranged* through her program.'" (*Ibid.*, italics added.)

The Court of Appeal in *Hunter* concluded that the juvenile court erred because the effect of the visitation order was to give the child "virtually complete discretion to veto visitation, and indeed all contact, with his mother, a discretion he exercised without any oversight or direction by the court. This was clearly improper. The juvenile court cannot impermissibly delegate to the child's therapist, [the child protective agency] or any third person, unlimited discretion to determine whether

22

visitation is to occur." (*Hunter*, *supra*, 142 Cal.App.4th at p. 1505.)

In this case, the juvenile court did not order visitation "'as can be arranged'" as in *Hunter*. (See *Hunter*, *supra*, 142 Cal.App.4th at pp. 1501.) Indeed, when the court was asked for clarification, it reiterated that its visitation order was to be a "minimum" of every other week. Of course, the boy (and the other children) could still refuse these court ordered visitations through their therapists, but the juvenile court did not appear to impermissibly delegate or give veto authority over its visitation order to the children, the Agency, or any other person. (Compare *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1005, 1009 [order that parent receive "'reasonable visitation'" was "'bare bones'" but nonetheless sufficient because it required some visitation and did not delegate to the social services agency the power to decide whether visits would occur].)[4]

## D. Denial of Request to Place Children with Great Aunt

Father H. claims the juvenile court abused its discretion by denying relative placement with Great Aunt (Mother joins). We find no abuse of discretion.

"Custody determinations in dependency proceedings are 'committed to the sound discretion of the juvenile court,' and such rulings 'should not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citation.] We will not disturb a custody determination ""unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'""" (*In re J.M.* (2020) 44 Cal.App.5th 707, 718.)

In this part of the discussion, we shall: 1) review general legal principles concerning requests for placement of dependent children with relatives; 2) summarize the

---

[4] We note that future requests for changes in the juvenile court's visitation order can be made based on a change of circumstances. (§ 388 (a)(1) ["Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action . . . for a hearing to change, modify, or set aside any order of court previously made"].)

juvenile court's ruling at the disposition hearing; and 3) analyze the facts as applied to the appropriate laws.

### 1. Relevant Legal Principles

"Section 361.3 gives 'preferential consideration' to placement requests by certain relatives upon the child's removal from the parents' physical custody at the dispositional hearing." (*In re N.V.* (2010) 189 Cal.App.4th 25, 30.) The application of the relative placement preference "require[s] the consideration of multiple factors all dependent on an examination of evidence relating to the minor's current circumstances. Consequently, a reflexive approach that children are always better off with relatives is incompatible with the governing laws . . . ." (*Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 489.)

Under section 361.3 (a), the relevant factors include: "(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] (3) The provisions of . . . the Family Code regarding relative placement. [¶] (4) Placement of siblings and half siblings in the same home, unless that placement is found to be contrary to the safety and well-being of any of the siblings . . . . [¶] (5) The good moral character of the relative and any other adult living in the home . . . . [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe, secure, and stable environment for the child. [¶] (B) Exercise proper and effective care and control of the child. [¶] (C) Provide a home and the necessities of life for the child. [¶] (D) Protect the child from his or her parents. [¶] (E) Facilitate court-ordered reunification efforts with the parents. [¶] (F) Facilitate visitation with the child's other relatives. [¶] (G) Facilitate implementation of all elements of the case plan. [¶] (H)(i)

24

Provide legal permanence for the child if reunification fails. [¶] . . . . [¶] (8)(A) The safety of the relative's home."

In addition, when considering a relative placement after the disposition hearing, "the county social worker shall consider whether the relative has established and maintained a relationship with the child." (§ 361.3 (d).) "'Relative' means an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great'. . . ." (§ 361.3 (c)(2).)

"The overriding concern of dependency proceedings, however, is not the interest of extended family members but the interest of the child. '[R]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected.' [Citation.] Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests." (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.)

### 2. *The Juvenile Court's Ruling at the Jurisdiction Hearing*

At the conclusion of the jurisdiction hearing, the juvenile court found Great Aunt's testimony was "credible . . . and the evidence supports that she was doing whatever she could . . . to support or to help these children."

The juvenile court found Great Aunt "took immediate and absolute steps to help the children within days of hearing that the children had been detained." The court noted "that her home was found suitable, and that she has unique and special skills regarding her background as an educator, and as a counselor, regarding issues that may or may not pertain to these children and their particular needs." The court also found there

were no "moral character issues," and "under all the other criteria," Great Aunt was "suitable" for "relative placement."

However, the juvenile court stated: "The issue that remains is going to be the issue of the relationship between the children and her ability to protect and [the] best interests of those children now." The court said it considered, "not just the relationship that exists now, but the relationship that existed prior to those children coming to California." The court found Great Aunt had a limited relationship with the children in Texas as a family member, such as "going to Christmas once a year maybe." But the court found Great Aunt had "no indication of any type of abuse with these children. So, it presents a difficult situation."

The juvenile court recalled the boy's earlier testimony, and his belief that Great Aunt "knew of the abuse, it's not that the court takes that as actual knowledge, but it does take it as where [the boy] is, in feeling safe and understanding how adults in his world should have or did know what's happening." The court found the boy "did not feel safe. [The boy] does not feel safe. And so I have to look very closely at that issue, and whether or not it would be detrimental under the circumstances, or whether or not it is in [the boy's] and the children's best interest to be placed with [Great Aunt] under these circumstances."

The court found the boy, who was now 10 years old, to be "extraordinarily bright. He is very articulate, way past his years, . . . [the boy] presents with a maturity and with an ability not only to discern right from wrong, for purposes of testimony, but he did a very credible job and a very good job of describing what this means for him and why." The court noted that the boy "was able to express he wanted to stay with the caretaker, and wanted to be with the caretaker because he feels safe and secure."

When announcing its ruling, the juvenile court stated that it had "done an independent review under the criteria of Welfare and Institutions Code 361.3." The court said it was "looking at the relationship, looking at the needs, looking at the potential

26

emotional as well as physical abuse that has happened and where we are currently, and the court looks, again, the best interests of the child."

The juvenile court concluded, "that with all of those considerations, that the motion to place with the relatives at this time, although so many of those factors have been found in favor of [Great Aunt], ultimately, the court, making a ruling in the best interests of the children, denies that motion and finds that it is not in the best interests of . . . these children to be placed with [Great Aunt] at this time; that the psychological and emotional stability and the very high complex-trauma nature of this particular case, and the lack of significant relationship with the [Great Aunt], again, on top of the feelings expressed by [the boy], support that finding."

### 3. Analysis and Application

It is readily apparent that the juvenile court carefully considered the underlying facts, applied the appropriate factors, and came to a reasoned decision within the bounds of its discretion. That is, the court plainly did not make its custody decision in an arbitrary or capricious manner. Thus, we find no abuse of the court's discretion. (See *In re J.M.*, *supra*, 44 Cal.App.5th at p. 718 [we will not disturb a custody determination "'""unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination'"""].)

Father H. argues "the juvenile court did not consider all the required factors under section 361.3." We see no evidence to support that argument.

Unless express findings are required, "we presume the court followed the law in making its determination [citation], including a consideration of the criteria set forth in [an applicable rule]." (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 698-699.)

Here, the juvenile court stated it had "done an independent review under the criteria of Welfare and Institutions Code 361.3." The court then referenced several of

27

those criteria (or factors) having to do with relative placement under section 361.3. The statute requires no statement of express findings; therefore, we presume the court, in fact, considered all the required factors within the statute.


### III

### DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


DELANEY, J.

28